

rah/2006R01332

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No. 13- **5 9 2** ($\mathcal{E}$ S) |
| | : | |
| v. | : | 18 U.S.C. §§ 371, 1341, 1343, |
| | : | 1952(a)(1) & (3), 1962(c) & |
| JOSEPH A. FERRIERO | : | § 2 |

## I N D I C T M E N T

The Grand Jury in and for the District of New Jersey,
sitting at Newark, charges:

### COUNT 1
(Racketeering)

## Individuals and Entities

1.    At all times relevant to Count 1 of this Indictment:

A.    Defendant JOSEPH A. FERRIERO was an attorney
licensed in New Jersey and a partner in a West Orange, New Jersey
law firm from in or about 2000 to on or about March 18, 2002, and
then in a Lyndhurst, New Jersey law firm (the "Lyndhurst Law
Firm") from on or about March 18, 2002 forward.   In or about
1998, defendant FERRIERO was elected Chairman of the Bergen
County Democratic Organization (the "BCDO").   He was re-elected
to this position in or about 2000, 2002, 2004, 2006, and 2008,
holding the position continuously until he resigned in or about
January 2009.

B.    The BCDO was an entity established pursuant to New
Jersey law as a county committee of the Democratic political
party.   Among other responsibilities, the BCDO selected

candidates to appear in the column assigned to the Democratic Party on the ballot for various federal, State, and local offices; coordinated fund-raising and political campaigns for such offices; and determined the position of the local Democratic party on various policy issues. As the Chairman of the BCDO, defendant FERRIERO provided opinions and recommendations to BCDO members and was in a position to influence, and did influence, the actions of BCDO members.

C. There was an individual ("Attorney 1") who was an attorney licensed in New Jersey and a partner in the Lyndhurst Law Firm.

D. There was an individual ("Attorney 2") who was an attorney licensed in New Jersey and a partner in the Lyndhurst Law Firm.

E. There was an individual ("Attorney 3") who was an attorney licensed in New Jersey and a partner in a Teaneck, New Jersey law firm (the "Teaneck Law Firm").

F. DENNIS J. OURY was an attorney licensed in New Jersey, a partner in a Hackensack, New Jersey law firm, and Counsel to the BCDO. From in or about January 2002 to in or about December 2002, and again from in or about January 2006 to in or about December 2007, OURY and his law firm served as the Borough Attorney for the Borough of Bergenfield, New Jersey. OURY's responsibilities as Borough Attorney included reviewing

2

and drafting municipal contracts and resolutions, attending meetings of the Borough Council, and providing legal counsel to the Mayor and Borough Council on Borough matters. As Borough Attorney, OURY had a duty of honest services to the Borough of Bergenfield that included the duty to refrain from accepting, or agreeing to accept, bribes and kickbacks offered in exchange for his official action and inaction. OURY, individually and through his law firm, also held, at various times, numerous other public offices in Bergen County, including, in or about the time periods indicated: (i) Counsel to the Bergen County Improvement Authority ("BCIA") (2002 to 2008); (ii) Borough of Fort Lee Special Counsel (2002 to 2007); and (iii) Fairview Board of Education Attorney (2002 to 2007).

G. There was an individual (the "Software Developer") who was an attorney licensed in the State of New Jersey and who operated several businesses, including (i) Xquizit Technologies ("Xquizit"), a web development business that, among other things, designed and implemented web sites; and (ii) C3 Holdings, LLC ("C3"), a business that provided citizen notification services to municipalities and other governmental entities. Xquizit and C3 were based at the same address in Nutley, New Jersey (the "Nutley Address").

H. Governmental Grants Consulting, LLC ("GGC") was an entity formed by defendant FERRIERO, OURY, and other individuals

3

in or about December 2001. GGC was never incorporated or otherwise registered with the State of New Jersey. Defendant FERRIERO provided OURY with a concealed ownership interest in GGC in exchange for OURY's agreement to exercise official action in Bergenfield in GGC's favor.

I.    The Teaneck Law Firm provided legal representation in New Jersey to a publicly traded Real Estate Investment Trust that was headquartered in Arlington, Virginia (the "Virginia REIT") and that, until in or about April 2007, was in the business of developing and owning shopping malls and other retail and entertainment properties in the United States and abroad. In or about February 2003, a joint venture led by the Virginia REIT was selected by the New Jersey Sports & Exposition Authority ("NJSEA") to build a retail and entertainment complex (the "Retail & Entertainment Project") on property owned by the NJSEA (the "NJSEA Site") in the New Jersey Meadowlands. The NJSEA Site, which was adjacent to the athletic stadiums in East Rutherford, New Jersey, was located in Bergen County.

J.    Concept Realization, LLC ("Concept Realization") was a limited liability company registered with the State of New Jersey on or about May 29, 2002, by defendant FERRIERO, Attorney 1, and Attorney 2.

K.    Gnoscere Limited, LLC ("Gnoscere") was a limited liability company registered with the State of New Jersey on or about January 23, 2004, by defendant FERRIERO, Attorney 1, and

4

Attorney 2.  Gnoscere was registered by defendant FERRIERO,
Attorney 1, and Attorney 2 after an October 7, 2003 newspaper
article disclosed the existence of Concept Realization and
reported defendant FERRIERO's false denial that he was involved
with the company.

   L. SJC Consulting, LLC ("SJC") was a limited
liability company of which defendant FERRIERO was the sole
member.  Defendant FERRIERO created and incorporated SJC in the
State of Nevada as a vehicle through which defendant FERRIERO
could secretly receive concealed bribes and kickbacks from the
Software Developer in connection with contracts between C3 and
various Bergen County municipalities.

   M. Braveside Capital, LLC ("Braveside") was owned and
maintained by the Software Developer at the Nutley Address and
was used by the Software Developer to secretly pay concealed
bribes and kickbacks to defendant FERRIERO in connection with
contracts between C3 and various Bergen County municipalities.

### The Enterprise

  2. At all times relevant to Count 1 of this Indictment,
the BCDO (referred to for purposes of this Count as the "BCDO
Enterprise") constituted an enterprise, as defined by Title 18,
United States Code, Section 1961(4), that was engaged in, and its
activities affected, interstate commerce.

## Objective of the Enterprise

3. One of defendant FERRIERO's objectives in conducting and participating in the affairs of the BCDO Enterprise was to secretly profit from his position as BCDO Chairman by (A) accepting concealed bribes and kickbacks from private individuals and entities in exchange for (i) his own opinions, recommendations, and exercises of discretion as a high-ranking party official; and (ii) the opinions, recommendations, and exercises of discretion of public officials who were members of the BCDO, including the Bergen County Executive, members of the Bergen County Board of Chosen Freeholders, and other County and municipal officials; (B) offering concealed bribes and kickbacks to municipal officials to induce them to take official action to benefit defendant FERRIERO's personal financial interests; and (C) inducing concealed payments from private individuals and entities, with their consent, based on the wrongful use of fear of economic harm.

## The Racketeering Violation

4. From in or about December 2001 to in or about October 2008, in the District of New Jersey, and elsewhere, defendant

JOSEPH A. FERRIERO,

being employed by and associated with the BCDO Enterprise, which enterprise was engaged in, and the activities of which affected, interstate commerce, knowingly and intentionally conducted and

6

participated, directly and indirectly, in the conduct of the affairs of the BCDO Enterprise through a pattern of racketeering activity, as that term is defined in Sections 1961(1) and 1961(5) of Title 18, United States Code, namely, through the commission of the racketeering acts set forth in Paragraph 77, below.

## Methods and Means of the Enterprise

5.    In 1998, when defendant FERRIERO was first elected Chairman of the BCDO, the position of Governor of the State of New Jersey, the position of Bergen County Executive, and a majority of the seats on the Bergen County Board of Chosen Freeholders (the "Freeholder Board") were held by members of the Republican Party.  During the general election held in November 2001, a member of the Democratic Party was elected Governor. During the general election held in November 2002, members of the Democratic Party and the BCDO were elected Bergen County Executive -- a position that defendant FERRIERO considered to be the second most important public office in the State of New Jersey, next to the Governor -- and gained a 5-2 majority of the seats on the Freeholder Board.  These events increased the power and influence that the BCDO and defendant FERRIERO, as its Chairman, were capable of exercising both Statewide and in Bergen County.  Defendant FERRIERO used this power and influence to extract payments from various individuals and entities in exchange for his official action and inaction as BCDO Chairman

7

and his influence over others in Bergen County and municipal government.

**The GGC Kickback Scheme**

6.     Prior to in or about December 2001, defendant FERRIERO used his influence and authority as Chairman of the BCDO to cause and attempt to cause DENNIS J. OURY to be appointed as Borough Attorney for the Borough of Bergenfield, New Jersey, in the following fashion:

A.     On or about December 31, 2000, after Democratic candidates had gained control of the Council of the Borough of Bergenfield, defendant FERRIERO contacted the Mayor of Bergenfield (the "Bergenfield Mayor"), also a member of the Democratic Party, and instructed the Bergenfield Mayor to nominate OURY as Bergenfield's Borough Attorney. The Bergenfield Mayor refused, because a majority of the Council had decided to re-nominate the existing Borough Attorney, who had originally been appointed by a Republican-controlled Council.

B.     On or about January 1, 2001, at the Borough of Bergenfield's annual reorganization meeting, the Bergenfield Mayor re-nominated the existing Borough Attorney for a one-year term.  The Democratic municipal chairman, who was seated in the room, made a throat-cutting gesture to the Bergenfield Mayor to indicate displeasure with this action.

8

C.    Subsequently, in or about mid-2001, defendant FERRIERO confronted the Bergenfield Mayor at a BCDO event and expressed his displeasure with the Bergenfield Mayor's failure to nominate OURY as Borough Attorney.

D.    In or about November 2001, after Democratic candidates were elected to maintain control over the Bergenfield Council, the Bergenfield Mayor and Council determined that it would nominate and appoint OURY as Bergenfield's Borough Attorney, at least in part because defendant FERRIERO had indicated that he wanted this to occur.

7.    In or about November or December 2001, defendant FERRIERO conceived the idea for GGC, in order to capitalize on defendant FERRIERO's access to and influence with State and local Democratic officials by assisting municipalities in obtaining State and local funding and then receiving compensation in the form of a percentage of any such award.  According to defendant FERRIERO's plan for the company, defendant FERRIERO's ownership of the company would at all times remain concealed.

8.    In or about December 2001, in order to receive favorable treatment for GGC in the Borough of Bergenfield and elsewhere, defendant FERRIERO offered and gave to OURY, and OURY accepted and received, a concealed ownership interest in GGC that entitled OURY to secretly receive an agreed-upon share of GGC's profits, including a share, or kickback, of profits received from municipalities, including Bergenfield, in which OURY served as a

9

public official. Defendant FERRIERO intended that this offer would influence OURY to take official action, including in his capacity as Bergenfield's Borough Attorney, in connection with matters involving GGC.

9. In or about December 2001, in order to receive favorable treatment in municipalities that were under Republican, rather than Democratic, control, defendant FERRIERO offered a Bergen County official and local mayor who was a member of the Republican Party (the "BC Official"), and the BC Official accepted, a concealed ownership interest in GGC that entitled the BC Official to secretly receive an agreed-upon share of GGC's profits.

10. Defendant FERRIERO, OURY, and the BC Official selected two individuals ("Individual 1 and Individual 2") as potential candidates to (A) perform the actual grant-writing services that GGC would provide; and (B) serve as the "public face" of GGC, thus allowing defendant FERRIERO, OURY, and the BC Official to conceal their roles in the company. Individuals 1 and 2 had an existing business (the "PR Business") that provided grant-writing services to municipalities, including the Bergen County municipality in which the BC Official served as Mayor. Individuals 1 and 2 expressed interest in participating as investors in GGC, but indicated that they did not want to serve as the company's grant-writers.

11. Between on or about December 27 and on or about

10

December 31, 2001, defendant FERRIERO and OURY agreed that OURY would create, and OURY did create, a proposed resolution for Bergenfield that provided that GGC would be retained as Bergenfield's "grantsman" in exchange for a $500 per month retainer fee as well as a "Consulting Grant Fulfillment Fee" calculated as a percentage of any grant or loan awarded.  The resolution misleadingly represented GGC to be an established corporation that was "in the business of assisting municipalities in making . . . grant applications and ha[d] a special expertise, training, and reputation in acquiring government grants, low-interest loans, and passive economic benefits for municipalities."

12.  On or about December 31, 2001, OURY sent to Bergenfield's Borough Administrator, via e-mail, a copy of the proposed resolution that he had prepared appointing GGC as the Borough's grantsman.  Minutes later, OURY forwarded his e-mail to the Borough Administrator, with the proposed resolution attached, to defendant FERRIERO's law firm assistant (the "Ferriero Assistant").

13.  At defendant FERRIERO's direction, the Ferriero Assistant then used the proposed Bergenfield resolution to create additional proposed resolutions appointing GGC as the municipal grantsman in several other Bergen County municipalities, as well as proposed contracts between those municipalities and GGC.  In order to conceal defendant FERRIERO's, OURY's, and the BC

11

Official's involvement in the company, the contracts listed the address of the PR Business as the address for GGC, and contained signature blanks for Individual 1, as GGC's "President," and Individual 2, as GGC's "Secretary," despite their never having agreed to assume such roles and despite the fact that they were unaware that their names and business address were being used in this fashion.

14.    On or about January 1, 2002, OURY attended the annual reorganization meeting of the Borough of Bergenfield and was sworn in as Borough Attorney. While the Borough Council was considering whether to appoint GGC as its municipal grantsman, OURY was asked by the Bergenfield Mayor to provide legal advice regarding the proposed resolution that OURY and defendant FERRIERO had agreed that OURY would draft. While intentionally failing to disclose the material fact that he held a concealed ownership interest in the company that entitled him to receive an agreed-upon share, or kickback, of its profits from Bergenfield, OURY provided advice to the Bergenfield Mayor and Council that encouraged them to pass the resolution and appoint GGC as Bergenfield's municipal grantsman. As a result, the Borough Council passed the resolution by a 4-2 vote and appointed GGC as the Borough's grantsman.

15.    In or about mid-January 2002, defendant FERRIERO, OURY, and the BC Official approached another individual ("Individual 3") regarding the possibility of Individual 3 serving as GGC's

12

grant-writer. Individual 3 had an existing business based in Bergen County that provided community planning and grant-writing services to municipalities. On or about January 25, 2002, defendant FERRIERO, OURY, and others met with Individual 3 at a diner in Bergen County and discussed engaging Individual 3's services as a grant-writer. Individual 3 subsequently agreed to become GGC's grant-writer.

16. According to a GGC "shareholders agreement" that was also partially executed on or about March 15, 2002, the duties and responsibilities of defendant FERRIERO, OURY, the BC Official and Individuals 1, 2, and 3 were "to serve in public relations making contact with various prospective clients and governmental agencies." Individuals 1, 2, and 3 had the additional duties and responsibilities of making "public appearances before various potential clients and public entities." Individual 3 alone had the responsibility "[t]o oversee grants writing and administration for [GGC]. Also, to meet with clients and make public appearances."

17. Shortly after signing the employment agreement between GGC and Individual 3 and partially executing the final shareholders agreement, in or about March or April 2002, Individuals 1 and 2 notified the BC Official that they were not interested in participating further in GGC and ceased their involvement with the company. Subsequently, in order to continue to conceal the ownership interests held by defendant FERRIERO,

13

OURY, and the BC Official, defendant FERRIERO caused Individual 3 to begin signing official documents as GGC's President and the Ferriero Assistant to begin signing as GGC's corporate Secretary.

18. On or about March 26, 2002, Individual 3 sent by United States mail to the Borough of Bergenfield an invoice for $6,000, representing GGC's monthly retainer for all 12 months of 2002. The invoice was not immediately paid, however, because GGC had no signed contract with the Borough.

19. On or about April 8, 2002, Individual 3 met with an individual whose family owned a piece of property (the "Estate") in Bergenfield. The Borough of Bergenfield was interested in acquiring the Estate as an historic site. On or about April 11, 2002, Individual 3 wrote a memorandum using GGC letterhead to the Bergenfield Borough Administrator regarding the purchase of the Estate (the "Estate Memo"). In the Estate Memo, Individual 3 indicated that the seller wanted $1.2 million for the property and suggested various grant opportorunities that GGC could pursue on Bergenfield's behalf, including grants from the Bergen County Open Space, Recreation, Farmland & Historic Preservation Trust Fund (the "Trust Fund") and the State of New Jersey Department of Environmental Protection ("DEP") Green Acres Program ("Green Acres"). Defendant FERRIERO received a copy of the Estate Memo from Individual 3 on or about April 12, 2002.

20. On or about April 17, 2002, defendant FERRIERO received

14

from OURY, by fax, a second copy of the Estate Memo -- one that OURY had received, in his capacity as Bergenfield's Borough Attorney, from the Borough Administrator. After receiving this fax from OURY, on or about April 20, 2002, defendant FERRIERO wrote a memorandum to Individual 3 in which he stated: "Please make applications to the entities for the purchase of [the Estate] and give me copies at which time I will push representatives of the State to fund these grants."

21. On or about May 7, 2002, Individual 3 wrote a memo on GGC letterhead to defendant FERRIERO and OURY in which Individual 3 noted, under the heading "Bergenfield," "No signed contract yet. Invoice for retainer sent to Boro; no action yet." Subsequently, acting in his capacity as Borough Attorney and based on the understanding that GGC could not receive payment from the Borough without an executed written agreement, OURY requested that the Bergenfield Borough Administrator obtain the signature of the Bergenfield Mayor on the January 1, 2002 resolution appointing GGC. In response to this request, on or about June 7, 2002, the Borough Administrator sent to OURY, by fax, a copy of the resolution bearing the Borough Administrator's signature and the signature of the Bergenfield Mayor.

22. At or about the same time, defendant FERRIERO supplied to OURY a proposed contract between GGC and the Borough that bore the signatures of Individual 3, as GGC's "President," and the Ferriero Assistant, as GGC's "Secretary." On or about June 10,

15

2002, acting in his capacity as Borough Attorney, OURY sent the proposed contract to Bergenfield's Borough Administrator together with a letter on his law firm letterhead. In the letter, OURY asked the Borough Administrator, "Would you kindly have the Mayor execute same and return a fully executed copy to [Individual 3]." OURY later determined that the signed resolution would suffice to allow GGC to receive payment from the Borough of Bergenfield. Therefore, on or about June 11, 2002, OURY faxed the signed resolution to defendant FERRIERO and Individual 3 with the notation, "for your records." Based on these official actions by OURY as Borough Attorney, the Borough paid GGC's $6,000 retainer fee on or about June 20, 2002, and defendant FERRIERO caused The Ferriero Assistant to deposit the proceeds in GGC's bank account.

23. On or about May 29, 2002, GGC, through Individual 3, applied on the Borough of Bergenfield's behalf for a Trust Fund grant. On or about August 14, 2002, GGC, through Individual 3, applied on the Borough of Bergenfield's behalf for a Green Acres grant. On or about August 27, 2002, defendant FERRIERO sent a copy of the Green Acres application directly to the Commissioner of the DEP via interstate private carrier, with a cover letter stating that it was "extremely important to [defendant FERRIERO] personally that this application receive favorable review by the Department."

24. By letter dated December 19, 2002, Bergen County officially notified the Borough of Bergenfield that it had been

awarded the Trust Fund grant in the amount of $800,000.  By
letter dated November 14, 2003, sent via U.S. Mail, the
Commissioner of the DEP officially notified the Borough that it
had been awarded a Green Acres grant in the provisional amount of
$372,500 and a Green Acres loan in the provisional amount of
$227,500, with the final amounts to be determined on the basis of
DEP's determination of the Estate's market value.

25.  As of on or about December 31, 2002, GGC's contract
with the Borough of Bergenfield expired.  As of on or about the
same date, OURY ceased to be the Borough Attorney in Bergenfield.
Shortly thereafter, on or about March 6, 2003, Individual 3 sent
the Borough of Bergenfield a GGC invoice for $80,000, reflecting
a ten percent "Consulting Grant Fulfillment Fee" calculated on
the basis of the $800,000 Trust Fund grant awarded to, but not
yet received by, the Borough.

26.  On or about April 30, 2003, defendant FERRIERO sent an
e-mail to Individual 3 asking whether the Borough of Bergenfield
had been "billed for the grant money they received."  After
defendant FERRIERO was informed by Individual 3 that Bergenfield
had been "billed on March 6th for the $80,000," defendant
FERRIERO sent an e-mail to OURY, on or about May 3, 2003, asking,
"What is status on bergenfield [sic]."

27.  On or about November 3, 2003, after learning that
Bergenfield was to be awarded a Green Acres grant and loan
package, Individual 3 sent the Borough of Bergenfield a GGC

17

invoice for $48,625, representing a ten percent "Consulting Grant Fulfillment Fee" calculated on the basis of the $372,500 Green Acres grant provisionally awarded to the Borough and a five percent "Consulting Grant Fulfillment Fee" calculated on the basis of the $227,500 Green Acres loan provisionally awarded to the Borough. Neither of the grants nor the loan had yet been received by the Borough of Bergenfield.

28. On or about May 26, 2004, based on the two invoices submitted by Individual 3, the Borough of Bergenfield issued a check for approximately $128,625 payable to GGC, representing its "Consulting Grant Fulfillment Fees" for both the Trust Fund grant and the Green Acres grant and loan.

29. Although the employment agreement between GGC and Individual 3 entitled Individual 3 to a monthly salary of $3,500, between in or about March 2002, when Individual 3 was hired, and on or about May 26, 2004, when the Borough of Bergenfield issued a $128,625 check to GGC, defendant FERRIERO made salary payments to Individual 3 on only three occasions:

> (A) a $3,500 salary payment on or about June 10, 2002;
>
> (B) a $5,000 salary payment on or about June 19, 2002; and
>
> (C) a $5,000 salary payment on or about August 14, 2002.

The only other expenses that defendant FERRIERO caused to be paid from GGC's bank account during this time were: (A) bank fees,

18

which were automatically deducted by the bank; and (B) a single check for $96.70, dated May 1, 2003, made payable to the Hackensack Postmaster. All remaining business expenses of GGC were borne by Individual 3 and Individual 3's existing community planning and grant-writing business.

30. In or about June 2004, after receiving the $128,625 check made payable to GGC from the Borough of Bergenfield, Individual 3 contacted defendant FERRIERO and notified him of the receipt of the check. Individual 3 informed defendant FERRIERO that Individual 3 would release the check to defendant FERRIERO if defendant FERRIERO agreed to pay Individual 3 $49,000 in overdue salary payments. Defendant FERRIERO agreed, and on or about June 11, 2004, Individual 3 sent the Bergenfield check via U.S. Mail to defendant FERRIERO. On or about June 17, 2004, pursuant to defendant FERRIERO's instructions, the Ferriero Assistant deposited the check into GGC's bank account.

31. On or about June 24, 2004, defendant JOSEPH FERRIERO issued a check to Individual 3 in the amount of $49,000, representing Individual 3's overdue salary payments. Defendant FERRIERO apportioned the majority of the remaining proceeds in GGC's bank account by issuing checks in the following amounts: $27,538.04 to himself; $25,016.97 each to OURY and the BC Official; and $19,393 to Individual 3. The Ferriero Assistant received a check for $1,000. Individuals 1 and 2 received nothing. The $25,016.97 share apportioned to OURY largely

19

consisted of OURY's share, or kickback, of the net proceeds to GGC from the Borough of Bergenfield.

32. On or about October 19, 2004, the Borough of Bergenfield finally received $800,000 in Trust Fund grant funds from the County of Bergen. On or about November 22, 2004, the Borough of Bergenfield further received $253,234.21 in Green Acres grant funds and $227,000 in Green Acres loan funds from the State of New Jersey. The grant amount received by the Borough from Green Acres was approximately $119,265.79 less than the amount that the Borough had been provisionally awarded and the amount upon which GGC based its "Consulting Grant Fulfillment Fee." This reduction in the grant amount occurred because Green Acres had determined that the market value of the Estate was substantially less than the amount estimated by GGC in the original Green Acres application, which, in turn, was due to the failure by both GGC and an appraiser hired by OURY on behalf of the Borough of Bergenfield to acknowledge an existing historic preservation easement on the property that protected it from development and therefore limited its resale value. The remaining amount of the grant award eventually was cancelled by Green Acres and not received by the Borough of Bergenfield.

33. On or about January 1, 2006, OURY was again retained as the Borough of Bergenfield's Borough Attorney, and thus regained the ability to take official action in GGC's favor. On or about March 29, 2006, Individual 3 sent a letter to the Bergenfield

20

Borough Administrator, by U.S. Mail, seeking to "re-introduce my firm and offer grant consultation services to the Borough of Bergenfield." OURY then caused a copy of this letter to be provided to his law firm associate, to whom he had delegated many of his responsibilities as Bergenfield Borough Attorney, with instructions to "tell [the associate] I would like to help [Individual 3] get the job over in Bergenfield." On this occasion, OURY's effort was unsuccessful.

**The Retail & Entertainment Project Bribery and Extortion Scheme**

34.   From in or about September 2002 to in or about
September 2006, defendant FERRIERO accepted a stream of payments
from the Virginia REIT, through the Teaneck Law Firm, in
connection with the Retail & Entertainment Project.   These
payments were made in exchange for defendant FERRIERO's
assistance, as BCDO Chairman, in obtaining endorsements and other
official action from public officials who were BCDO members, as
well as to prevent defendant FERRIERO from opposing the project
among those with whom he had political influence.

35.   In or about February 2002, representatives of the
Virginia REIT and the Teaneck Law Firm met with the Governor and
representatives of the NJSEA to discuss the Virginia REIT's
interest in developing the NJSEA Site.   The Virginia REIT and the
Teaneck Law Firm were aware that public support, including
support from State and Bergen County public officials, would be
important to its success in such a venture.

36.   On or about February 26, 2002, Attorney 3, acting on
behalf of the Virginia REIT, spoke with defendant FERRIERO.
Approximately one week later, on or about March 4, 2002, Attorney
3 attended a meeting with "Bergen County Democrats."   Defendant
FERRIERO spoke with Attorney 3 again on or about March 5 and
March 6, 2002.

22

37. On or about March 8, 2002, defendant FERRIERO, Attorney 1, and Attorney 2 signed an agreement pursuant to which defendant FERRIERO agreed to join the Lyndhurst Law Firm, effective March 18, 2002. The agreement provided that "immediately" upon defendant FERRIERO's joining the Lyndhurst Law Firm, FERRIERO and "equity members" of the firm would start a "governmental relations," or lobbying, firm.

38. On or about March 11, 2002, the BCDO selected an individual who was then serving as a Bergen County Freeholder as its candidate for Bergen County Executive. This individual (the "Bergen County Executive"), who ran unopposed for the Democratic nomination in the Party's primary in June, won the general election held in November 2002. The Bergen County Executive's campaign received considerable financial support from the BCDO. As Chairman of the BCDO, defendant FERRIERO was instrumental in selecting the Bergen County Executive as a candidate for office and was heavily involved in the Bergen County Executive's campaign. Defendant FERRIERO served as the official campaign manager for the Bergen County Executive and the two Democratic Freeholder candidates ("Freeholder 1" and "Freeholder 2") who ran on a slate with the Bergen County Executive. The Bergen County Executive, Freeholder 1, and Freeholder 2 each were members of the BCDO.

39. From in or about March 2002 to on or about May 3, 2002, the Teaneck Law Firm and Attorney 3 developed an "outreach plan"

23

to garner support from public officials for the Virginia REIT to be selected to develop the NJSEA Site.  On or about May 3, 2002, the "[Virginia REIT] Project Team" held a meeting, attended by representatives of the Teaneck Law Firm, its public relations representatives, and others, to "Review Implementation of [its] Public Relations Plan" and to discuss the "Establishment of Outreach Plan for Government and Special Interests."  The written "Outreach Plan" included a list of "Key Government Officials and Special Interests" that included various State and Bergen County officials and candidates for public office.  The name of the Bergen County Executive, then a candidate for that office, appeared near the top of the list, followed by "J. Ferriero," in parentheses.

40.  On or about May 14, 2002, Attorney 3 participated in a phone call with the Bergen County Executive, then a candidate for that office.  The next day, on or about May 15, 2002, Attorney 3 "attend[ed] meeting w/County Executive candidate re: [Virginia REIT] presentation."  In the following days, Attorney 3 also participated in a number of other meetings and calls with "public officials," "local officials," and "public leaders."

41.  On or about May 29, 2002, defendant FERRIERO, Attorney 1, and Attorney 2 formed Concept Realization, LLC and registered the company with the State of New Jersey.  Neither Concept Realization, defendant FERRIERO, Attorney 1, Attorney 2, Gnoscere, nor any other company operated by FERRIERO, Attorney 1,

24

or Attorney 2 ever registered as a "governmental affairs agent"
with the New Jersey Election Law Enforcement Commission
("NJELEC"). Registration with NJELEC is required of any
individual or entity that lobbies State officials, including
legislators and members of State agencies and authorities, in
exchange for pay. Registration with NJELEC is not required for
lobbying County or local officials.

42. On or about June 29, 2002, the NJSEA issued an RFP for
Meadowlands Redevelopment (the "NJSEA RFP"), seeking proposals to
redevelop the NJSEA Site. The NJSEA RFP provided that responses
were due on or before September 17, 2002.

43. In or about August 2002, defendant FERRIERO contacted
Attorney 3 and suggested that defendant FERRIERO, Attorney 3,
Attorney 1, and Attorney 2 meet at a restaurant, purportedly so
that Attorney 3, Attorney 1, and Attorney 2 could settle certain
differences among themselves. At the meeting, however, defendant
FERRIERO, Attorney 1, and Attorney 2 informed Attorney 3 that
they had been asked to represent a principal competitor of the
Virginia REIT in connection with the NJSEA RFP and that the
competitor intended to use "scorched earth" tactics to defeat the
Virginia REIT. Defendant FERRIERO, Attorney 1, and Attorney 2
stated that they would work for the Virginia REIT instead in
exchange for a payment of $35,000 per month. Attorney 3 agreed
to discuss this proposal with representatives of the Virginia
REIT.

44. Subsequently, Attorney 3 recommended to an Executive Vice President of the Virginia REIT (the "Executive VP") that the Virginia REIT agree to pay Concept Realization $35,000 on a monthly basis in exchange for (A) defendant FERRIERO's agreement not to publicly oppose, or to cause members of the BCDO or other public officials with whom he had influence as a result of his position as Chairman of the BCDO to publicly oppose, the Virginia REIT's proposal to the NJSEA; and (B) defendant FERRIERO's assistance in obtaining endorsements, public support, and other official action and inaction regarding the Virginia REIT's proposal to the NJSEA from members of the BCDO and other public officials with whom he had influence as a result of his position as Chairman of the BCDO. Attorney 3 informed the Executive VP, in substance and in part, that opposition by defendant FERRIERO to the proposal would be significantly detrimental to the Virginia REIT's efforts to be selected to develop the NJSEA Site. The Executive VP feared that failure to develop the NJSEA Site would cause the Virginia REIT to lose a substantial investment and affect the Virginia REIT's stock price. Based on the Virginia REIT's reasonable fear of economic harm, therefore, and its desire to obtain defendant FERRIERO's official assistance as a party official, the Executive VP agreed with Attorney 3 to make the $35,000 monthly payments to Concept Realization. No written agreement or contract between Concept Realization and the Teaneck Law Firm or the Virginia REIT was ever signed to memorialize the

26

agreement.

45. On or about August 27, 2002, at defendant FERRIERO's request, defendant FERRIERO met with an individual ("the Baseball Team Owner") who previously had expressed interest in operating a minor league baseball franchise in Bergen County. At the meeting, defendant FERRIERO solicited the Baseball Team Owner to participate in the Virginia REIT's proposal to the NJSEA, and asked the Baseball Team Owner to meet with Attorney 3 to discuss such participation. Defendant FERRIERO spoke with Attorney 3 that day and each of the two following days. On or about August 28, a member of the Teaneck Law Firm began to research "baseball park issues" in connection with the Virginia REIT's proposal to the NJSEA.

46. On or about September 4, 2002, defendant FERRIERO met with the Baseball Team Owner and Attorney 3. At the meeting, the Baseball Team Owner reached an oral agreement with Attorney 3 that the Virginia REIT would include a minor league ballpark, to be occupied by the Baseball Team Owner's planned franchise, in its proposal to the NJSEA. This agreement was not immediately publicly disclosed.

47. On or about September 8, 2002, defendant FERRIERO, in his capacity as BCDO Chairman, caused a consultant to and spokesperson for the BCDO (the "BCDO Consultant") to prepare "talking points" for the Bergen County Executive, Freeholder 1, and Freeholder 2 (at that point, still candidates for those

27

offices), as well as a draft press release and press advisory announcing a "major announcement" regarding "the Meadowlands Sports Complex" to be made by the Bergen County Executive, Freeholder 1, and Freeholder 2 on or about September 9, 2002. The BCDO Consultant e-mailed the talking points, draft press release, and press advisory to the Virginia REIT's public relations representative on the evening of September 8, 2002. In the e-mail, the BCDO Consultant stated that "[defendant FERRIERO] wanted me to send [the talking points and draft press release] to you ASAP."

48. On or about September 9, 2002, defendant FERRIERO, in his capacity as BCDO Chairman, caused the Bergen County Executive, Freeholder 1, and Freeholder 2 (at that point, still candidates for those offices) to hold a press conference at the NJSEA Site. At the press conference, the Bergen County Executive, Freeholder 1, and Freeholder 2 stated that they favored construction of a minor league ballpark and that any developer responding to the NJSEA RFP who "team[ed] up" with the Baseball Team Owner would likely receive their support. Representatives for at least two other developers who planned to respond to the NJSEA RFP subsequently approached the Baseball Team Owner about participating in their response to the RFP. The Baseball Team Owner turned them away, having already agreed with defendant FERRIERO and Attorney 3 that the Baseball Team Owner would participate in the proposal to be made by the Virginia

REIT.

49.  On or about September 17, 2002, a joint venture led by the Virginia REIT ("the Virginia REIT JV") submitted a proposal to the NJSEA in response to the NJSEA RFP.  Five other developers also submitted their own proposals.  The Virginia REIT JV's proposal included a proposed minor league ballpark, as agreed. On the same day, the BCDO issued a newsletter, titled "The Bergen Blast" and bearing defendant FERRIERO's name, as Chairman, which, among other things, summarized the press conference held on or about September 9, 2002, by the Bergen County Executive, Freeholder 1, and Freeholder 2, and stated that "[t]he three candidates were glad to hear that at least one development plan for the Meadowlands would include a plan for a minor league ballpark."

50.  On September 30, 2002, defendant FERRIERO met with Attorney 3 and the Virginia REIT's public relations representatives to discuss "strategy and possible endorsements." On or about that date, defendant FERRIERO caused the Ferriero Assistant to issue a $35,000 invoice from Concept Realization to the Teaneck Law Firm for "governmental relations consulting" for the month of September 2002.  The cover letter that accompanied the invoice was prepared by the Ferriero Assistant but signed by Attorney 1 rather than defendant FERRIERO.

51.  In or about October 2002, defendant FERRIERO arranged for the Bergen County Executive, Freeholder 1, Freeholder 2, and

other public and party officials to attend presentations at the Lyndhurst Law Firm regarding the Virginia REIT JV's proposal to the NJSEA. Attorney 3 conducted these presentations, at which defendant FERRIERO was present in his capacity as BCDO Chairman.

52. On or about October 31, 2002, Concept Realization received a check for $35,000 from the Teaneck Law Firm, in payment of the September 30 invoice that defendant FERRIERO had caused the Ferriero Assistant to prepare. The $35,000 expenditure was billed by the Teaneck Law Firm to the Virginia REIT as part of the firm's regular billings regarding the NJSEA Site, and was paid by the Virginia REIT as part of their payments of those bills.

53. On or about November 5, 2002, the Bergen County Executive, Freeholder 1, and Freeholder 2 prevailed in their respective elections and were elected to terms of office beginning in January 2003. On or about November 22, 2002, Attorney 3 caused the Teaneck Law Firm to issue a payment in the amount of $35,000 to Concept Realization for "consulting services" for October 2002, despite the fact that no invoice had been received.

54. On or about December 4, 2002, defendant FERRIERO caused to be faxed to Attorney 3 sixteen separate monthly invoices from "Concepts [sic] Realization, LLC" to the Teaneck Law Firm. These monthly invoices covered the period of November 2002 as well as each consecutive month going forward through February 2004. Each

charged the Teaneck Law Firm $35,000 "for services rendered." On
or about the following day, December 5, 2002, defendant FERRIERO
and Attorney 3 discussed "endorsements."

55. The Teaneck Law Firm proceeded to pay the sixteen
invoices from "Concepts [sic] Realization" on an approximately
monthly basis, and continued to bill the Virginia REIT for
reimbursement of these expenditures. When the Teaneck Law Firm
ran out of invoices, in or about March 2004, Attorney 3 directed
the billing partner on the matter to obtain additional invoices
from defendant FERRIERO so that the Teaneck Law Firm could
continue to make the payments. Concept Realization continued to
receive $35,000 monthly payments from the Teaneck Firm until in
or about September 2006. Over this period of time, the payments
to Concept Realization totaled approximately $1.7 million.

56. On or about December 23, 2002, the BCDO Consultant e-
mailed to a public relations representative of the Virginia REIT
a document titled "[Bergen County Executive] Statement on
[Virginia REIT] Proposal." The statement said, among other
things, that the Bergen County Executive was "supportive of the
overall concept of the [Virginia REIT] proposal and its many
attributes," and listed the name and telephone number of the
individual who had been selected to be the incoming Bergen County
Executive's press secretary (the "Press Secretary"). The public
relations representative forwarded the e-mail and attached
statement to Attorney 3 later that morning. That day, Attorney 3

31

spoke with defendant FERRIERO and the Press Secretary.

57. Two days later, on or about December 25, 2002, defendant FERRIERO and Attorney 3 spoke again. On the same day, the press reported that the Bergen County Executive had announced his official endorsement of the Virginia REIT JV and its proposal to the NJSEA. The Teaneck Law Firm notified the NJSEA of this endorsement on or about December 30, 2002 as a reason that the NJSEA should select the Virginia REIT JV to develop the NJSEA Site.

58. On or about January 29, 2003, defendant FERRIERO spoke with Attorney 3. On the same day, Attorney 3 received from the Virginia REIT's public relations representatives a draft resolution of the Bergen County Board of Chosen Freeholders endorsing the Virginia REIT JV and its proposal to the NJSEA. On or about January 31, 2003, Attorney 3 and another member of the Teaneck Law Firm spent time working on the resolution.

59. On or about February 4, 2003, defendant FERRIERO spoke with Attorney 3. On the same day, at the direction of defendant FERRIERO, the BCDO Consultant spoke with Attorney 3 regarding an endorsement by public officials of the Virginia REIT JV and its proposal to the NJSEA. Defendant FERRIERO, in his capacity as BCDO Chairman, directed the BCDO Consultant to act as a facilitator for this endorsement.

60. On or about February 5, 2003, defendant FERRIERO spoke

32

again to Attorney 3.   That evening, the Freeholder Board voted,
along party lines, to pass a resolution endorsing the Virginia
REIT JV and its proposal to the NJSEA.   The resolution was
proposed by Freeholder 1 and seconded by Freeholder 2.   The two
Republican Freeholders both complained at the meeting that they
had received the proposed resolution only at 5 p.m. the day
previously, and had not had an opportunity to form an opinion.
All five of the Democratic Freeholders spoke in favor of the
resolution and of the Virginia REIT JV's proposal.   The
resolution passed with four affirmative votes from Democratic
Freeholders, including Freeholder 1 and Freeholder 2.   The
Republican Freeholders and one Democratic Freeholder -- whose
spouse was employed by the Teaneck Law Firm -- abstained from the
vote.

61.   On or about January 27, 2003, a New Jersey State
Senator representing Bergen County (the "Senator"), a member of
the BCDO, introduced proposed legislation that would have
restricted the NJSEA's ability to approve development projects at
the stadium site with a retail component.   The Virginia REIT JV's
proposal, which was often characterized by its opponents as a
"mega-mall," had such a retail component.   On or about January
28, 2003, Attorney 3 reviewed this proposed legislation, spoke
with defendant FERRIERO by telephone, and sent him
"correspondence . . . regarding [Senator's] bill."   Attorney 3
reviewed the proposed legislation again on or about February 7,

33

2003 and, on the same day, spoke by telephone with defendant FERRIERO and with "legislator." On or about March 3, 2003, the Senator withdrew the bill from consideration.

62. On or about February 12, 2003, the NJSEA announced that the Virginia REIT JV had been selected to develop the Retail & Entertainment Project at the NJSEA Site. The redevelopment agreement for the Retail & Entertainment Project was signed on or about December 3, 2003. The schedule attached to the agreement listing "Project Professionals," including "Government and Public Relations" professionals, did not list defendant FERRIERO or Concept Realization as a paid governmental relations consultant to the Virginia REIT or the Virginia REIT JV.

63. In or about December 2003, the relationship between the Baseball Team Owner and the Virginia REIT began to deteriorate, and the Baseball Team Owner reached out to defendant FERRIERO, as Chairman of the BCDO, for assistance in resolving the situation. Defendant FERRIERO, Attorney 1, and Attorney 2 agreed, in exchange for "performance fees" and other promises of payment by the Baseball Team Owner, to assist the Baseball Team Owner with the Baseball Team Owner's efforts to ensure that the Virginia REIT constructed a minor league ballpark as part of the Retail & Entertainment Project. The Baseball Team Owner was at no time aware, nor did defendant FERRIERO ever disclose, that defendant FERRIERO, Attorney 1, and Attorney 2 were already receiving, through Concept Realization, a stream of $35,000 monthly payments

34

from the Virginia REIT through the Teaneck Law Firm.

64. On or about October 4, 2004, the NJSEA gave its final approval to the Retail & Entertainment Project. The next day, on or about October 5, 2004, the Governor signed the ground lease between the NJSEA and the Virginia REIT JV at a ceremony held at the NJSEA site.

65. By 2005, the proposed minor league baseball park at the NJSEA site was the subject of a lawsuit by the Baseball Team Owner and a Request for Proposals ("RFP") by the Virginia REIT seeking another baseball team to occupy the ballpark. From in or about 2004 to in or about July 2006, defendant FERRIERO and Attorney 3 spoke frequently regarding the minor league ballpark issue. On July 14, 2006, defendant FERRIERO conducted a conference call with Attorney 3 and the Bergen County Counsel -- a former employee of the Lyndhurst Law Firm -- regarding "extension of RFP." That day, Attorney 3 faxed a letter to the Bergen County Counsel in which he expressed appreciation for "the County Executive's desire and efforts to intervene in this matter and hopefully move this project ahead now rather than at some future time." Attorney 3 further stated that the Virginia REIT JV "has agreed to the request of the County Executive to hold back sending out the Request for Proposals for the minor league ballpark for a reasonable period of time, but not in excess of two weeks." Attorney 3 concluded, "Please thank the County Executive for his help and cooperation."

66.    Defendant FERRIERO spoke with Attorney 3 again on July 20, 24, and 25, on the latter date "regarding [Baseball Team]." On July 26, 2006, Attorney 3 attended a meeting with the Bergen County Executive regarding the future of the baseball component of the plans for the NJSEA Site and spoke by telephone with FERRIERO.

67.    On or about August 22, 2006, the Virginia REIT reached an agreement to sell its majority stake in the Retail & Entertainment Project.  This sale was completed in or about November 2006.  The last payment from the Teaneck Law Firm to Concept Realization in connection with the Retail & Entertainment Project occurred on September 30, 2006.  Most of the Virginia REIT's remaining assets subsequently were purchased by a joint venture between an Indiana-based owner and operator of shopping malls and an investment firm.  In 2007, this joint venture liquidated the Virginia REIT's stock and dissolved the corporation.

36

**The SJC Bribery Scheme**

68.   Beginning in or about 2007, the Software Developer sought to obtain contracts between Xquizit and C3 and various Bergen County municipalities and other public entities.   In or about August 2007, defendant FERRIERO and the Software Developer agreed that defendant FERRIERO would recommend and provide a favorable opinion of the Software Developer, Xquizit, C3, and the services provided by Xquizit and C3 to the local government officials in Bergen County with whom defendant FERRIERO had influence as a result of his position as a party official, without disclosing to those public officials that he stood to profit financially if these companies were retained as a result of his influence and recommendations.   In exchange for defendant FERRIERO's influence and recommendations, the Software Developer agreed to secretly pay kickbacks to defendant FERRIERO calculated as a percentage of the fees that Xquizit and C3 received.

69.   On or about September 17, 2007, defendant FERRIERO sent an e-mail to the Software Developer instructing the Software Developer to "Please give me the name and address u want to use on the consulting agreement."   The Software Developer responded, minutes later, with the name of Braveside and the Nutley Address. Defendant FERRIERO then forwarded that information to his secretary.

70. From in or about February 2008 to in or about April 2008, defendant FERRIERO, his secretary, and the Software Developer worked together to create and incorporate SJC in the State of Nevada. To do so, they used a business incorporation service located in Las Vegas, Nevada (the "Nevada Company") and communicated with representatives of the Nevada Company on numerous occasions via the U.S. Mail and wire communications in interstate commerce. For example, on April 15, 2008, defendant FERRIERO caused his secretary to use the U.S. Mail to send from New Jersey to Las Vegas, Nevada, copies of incorporation documents for SJC Consulting, LLC, that had been signed and executed by defendant FERRIERO. On or about April 24, 2008, the Software Developer used the internet to apply for and receive an Employer Identification Number for SJC from the IRS in Cincinnati, Ohio.

71. On or about April 25, 2008, defendant FERRIERO signed, on behalf of SJC, a letter agreement dated April 22, 2008, that purported "to memorialize the agreed upon terms of the agreement entered into as of September 2007 between [Braveside] and SJC Consulting . . . to provide governmental relations consulting services required in connection with marketing of a product known as [C3's product] and any other related products or services." The Software Developer signed the agreement, on behalf of Braveside, on or about April 29, 2008.

72. The written agreement between SJC and Braveside further stated, in substance and in part, that SJC agreed to "provide guidance" regarding an "action plan" to "promote local governmental support" in connection with C3. It further entitled SJC to receive a "professional fee of twenty-five percent (25%) gross revenue generated from the sale of [C3's] product . . ." and provided that "the professional fee may be adjusted to 1/3 on a case by case basis, but never to exceed 1/3."

73. From in or about August 2007 to at least in or about July 2008, in exchange for payments made pursuant to his agreement with the Software Developer, defendant FERRIERO used his official position as BCDO Chairman and influence as a high-ranking party official on numerous occasions to provide a favorable opinion of, and recommend, the Software Developer, Xquizit, C3, and the products and services provided by Xquizit and C3 to local government officials who were members of the BCDO, without disclosing to those officials that he had a financial interest in the contracts obtained by Xquizit and C3, including as follows:

A. In or about 2004, defendant FERRIERO falsely represented to a high-ranking public official in the Borough of Dumont, New Jersey (the "Dumont Public Official"), who was a member of the Democratic Party and the BCDO, that defendant FERRIERO would never recommend to the Dumont Public Official, and would never cause the Borough of Dumont to hire, any business in

which defendant FERRIERO held a personal financial interest.

B.    Beginning in or about August 2007, defendant FERRIERO communicated on multiple occasions with the Dumont Public Official regarding C3.  Notwithstanding his earlier representations and promises to the Dumont Public Official, defendant FERRIERO provided the Dumont Public Official with a favorable opinion of C3 and indicated to the Dumont Public Official that he personally recommended C3, without disclosing to the Dumont Public Official that he had an agreement with the Software Developer that entitled him to receive a kickback of a percentage of the proceeds from any contract between Dumont and C3.  As a result of defendant FERRIERO's false representations and deliberate omissions, Dumont retained C3, effective on or about January 1, 2008, at a rate of approximately $1,500 per month.

C.    On or about August 13, 2007, at a restaurant located in a hotel in Hasbrouck Heights, New Jersey, defendant FERRIERO introduced the Software Developer to a member of the Teaneck, New Jersey, Township Council (the "Teaneck Councilperson"), who was a member of the Democratic Party and the BCDO.  Defendant FERRIERO did not disclose to the Teaneck Councilperson that he had a financial arrangement with the Software Developer according to which he would receive a kickback of a percentage of the proceeds from any contract between Teaneck and C3.  On or about August 23, 2007, the Software Developer sent

40

an e-mail to defendant FERRIERO stating that "[t]he gentleman
that you met with that morning (Teaneck), got me in touch with
the Teaneck BA, who I have scheduled for 2 pm Monday." Teaneck
subsequently retained C3, effective on or about January 1, 2008,
at a rate of approximately $2,000 per month.

     D.   Beginning in or about August 2007, defendant
FERRIERO on several occasions communicated with a high-ranking
public official in the Borough of Wood-Ridge, New Jersey ("Wood-
Ridge Public Official #1"), who was a member of the Democratic
Party and the BCDO, regarding C3. Defendant FERRIERO did not
disclose to Wood-Ridge Public Official #1 that he had a financial
arrangement with the Software Developer according to which he
would receive a kickback of a percentage of the proceeds from any
contract between Wood-Ridge and C3. On or about August 23, 2007,
the Software Developer sent an e-mail to defendant FERRIERO
confirming that Wood-Ridge Public Official #1 "want[ed] to get
[C3] on the agenda and voted on asap." On or about December 30,
2007, the Software Developer sent an e-mail to another Wood-Ridge
public official ("Wood-Ridge Public Official #2"), attaching a
proposed contract between C3 and the Borough of Wood-Ridge and an
invoice for C3's services for the first quarter of 2008.   The
Software Developer thanked Wood-Ridge Public Official #2 for
"fast-tracking the process." On or about April 15, 2008, Wood-
Ridge Public Official #2 sent an e-mail to the Software Developer
informing the Software Developer that the Wood-Ridge Council

                              41

"ha[d] not authorized [Wood-Ridge Public Official #2] to proceed
with your contract."  The Software Developer forwarded this e-
mail to defendant FERRIERO on or about April 16, 2008, with the
message "Fyi... ugh."  Defendant FERRIERO responded, also on or
about April 16, 2008, "K let's get 2gether tomorrow."
Subsequently, in or about July 2008, defendant FERRIERO, in the
presence of the Software Developer, confronted Wood-Ridge Public
Officials #1 and #2 at a BCDO-sponsored event and angrily
demanded to know why Wood-Ridge had not retained C3.

      E.    In or about November 2007, at a BCDO-sponsored
event at an annual gathering of municipal and other public
officials in Atlantic City, New Jersey, defendant FERRIERO
introduced the Software Developer to a high-ranking public
official in the Township of Saddle Brook, New Jersey (the "Saddle
Brook Public Official"), who was a member of the Democratic Party
and the BCDO, and recommended C3 to the Saddle Brook Public
Official.  Defendant FERRIERO did not disclose to the Saddle
Brook Public Official that he had a financial arrangement with
the Software Developer according to which he would receive a
kickback of a percentage of the proceeds from any contract
between Saddle Brook and C3.  Saddle Brook subsequently retained
C3, effective on or about January 1, 2008, at a rate of
approximately $2,000 per month.

      F.    In or about April 2008, after a presentation made
by the Software Developer to public officials of the Borough of

42

Cliffside Park, New Jersey regarding C3, defendant FERRIERO contacted a public official in Cliffside Park ("Cliffside Park Public Official #1") and provided a favorable opinion of, and recommended, the Software Developer. Defendant FERRIERO did not disclose to Cliffside Park Public Official #1 that he had a financial arrangement with the Software Developer according to which he would receive a kickback of a percentage of the proceeds from any contract between Cliffside Park and C3. Before the Cliffside Park Council voted on the retention of C3, Cliffside Park Public Official #1 made at least one Cliffside Park Councilperson aware of defendant FERRIERO's recommendation. Cliffside Park subsequently retained C3, effective in or about May 2008, at a rate of approximately $2,000 per month.

G. Prior to signing a contract with C3, however, Cliffside Park officials developed a concern that defendant FERRIERO might have an undisclosed financial interest in C3. In response to an inquiry from another Cliffside Park public official ("Cliffside Park Public Official #2"), the Software Developer, on or about July 9, 2008, transmitted to Cliffside Park Public Officials #1 and #2, via e-mail, paperwork showing that the Software Developer was the sole member of C3. The Software Developer intentionally did not disclose to the Cliffside Park officials defendant FERRIERO's separate agreement with Braveside entitling defendant FERRIERO to secretly receive a kickback of at least 25 percent of the gross revenues of C3's

43

contract with Cliffside Park.

74. From in or about August 2007 to at least in or about April 2008, defendant FERRIERO and the Software Developer corresponded with each other on numerous occasions in furtherance of their unlawful arrangement, including through the use of wire communications in interstate commerce. On December 30, 2007, for example, the Software Developer sent an e-mail from New Jersey to defendant FERRIERO, who was at that time vacationing in Colorado, titled "UPDATE." The e-mail attached contracts and first quarter invoices for the towns of Dumont, Teaneck, and Wood-Ridge and indicated that the same would be sent via fax for Saddle Brook. The e-mail further summarized the Software Developer's efforts to obtain contracts for C3 in 12 other municipalities and listed another nine municipalities that the Software Developer described as "within our reach." All of the municipalities listed were Bergen County municipalities and, in most cases, were municipalities in which members of the Democratic party either held, or would hold as of January 1, 2008, the majority of the positions on the municipalities' governing bodies. Regarding one municipality that was transferring from Republican to Democratic control, the Software Developer indicated that "this will need your intervention and they want to move very quick, so as soon as you touch down in NJ, that might need to be one of your first calls." Regarding another municipality, in which control recently had shifted from the Republican to the Democratic party

44

as a result of a change in the political affiliation of several of the municipality's public officials, including its mayor, the Software Developer stated: "Mayor absolutely loves [C3] and wants it, but is going to need you to solidify." Regarding certain towns that were transferring from Democratic to Republican control, the Software Developer noted that there was a "new regime" and that he was "in a holding pattern" or "not sure how to move forward." Defendant FERRIERO responded to the Software Developer's e-mail the same day and stated that he still was vacationing and would return on or about January 1 or 2, 2008.

75. From on or about May 16, 2008, to on or about September 18, 2008, defendant FERRIERO and the Software Developer caused Braveside to issue the following checks to SJC Consulting, LLC, representing defendant FERRIERO's 25 percent kickback of the gross revenues from the Dumont, Teaneck, Saddle Brook, and Cliffside Park contracts obtained by C3 as a result of defendant FERRIERO's favorable influence, recommendations, and acts of discretion:

| DATE OF CHECK | AMOUNT | MEMO LINE OF CHECK |
|---|---|---|
| 5/16/08 | $4,125 | Q1/Q2 SB /Q1 Dumont |
| 7/27/08 | $5,125 | Q1: Teaneck Q2: Teaneck, Dumont + CP - Q2 (2 m) |
| 9/18/08 | $2,625 | Q3 Saddle Brook & Dumont |

On or about September 9, 2008, defendant FERRIERO was indicted by a federal grand jury and the payments from Braveside to SJC

ceased shortly thereafter.

76. From on or about August 1, 2008, to on or about October 1, 2008, defendant FERRIERO caused the proceeds of these kickbacks, together with an additional $5,000 check to SJC from another source that was deposited in SJC's bank account on or about September 18, 2008, to be distributed as follows:

| DATE OF CHECK | AMOUNT | PAYEE |
|---|---|---|
| 8/1/08 | $4,000 | Joseph A. Ferriero |
| 8/6/08 | $1,500 | Joseph A. Ferriero |
| 9/26/08 | $4,000 | Joseph A. Ferriero |
| 10/1/08 | $3,900 | Joseph A. Ferriero |

## The Pattern of Racketeering Activity

77.   The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

### Racketeering Act #1
### (The GGC Bribery and Kickback Scheme)
### (Paragraphs 6-33 Above)

Defendant JOSEPH A. FERRIERO committed the following acts, any one of which alone constitutes the commission of Racketeering Act #1:

A.    From in or about December 2001 to on or about March 29, 2006, in Bergen County, in the District of New Jersey and elsewhere, defendant

JOSEPH A. FERRIERO

committed an act involving bribery, that is, defendant FERRIERO offered and conferred upon DENNIS J. OURY a benefit, namely, a concealed financial interest in GGC that entitled OURY to a share of GGC's profits, as consideration for (i) OURY's performance of his official duties in the Borough of Bergenfield in GGC's favor, and (ii) OURY's decisions, opinions, recommendations, and exercises of discretion as a public official in Bergenfield, in violation of N.J. Stat. Ann. § 2C:27-2.

B.    On or about May 3, 2003, in Bergen County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud

47

the Borough of Bergenfield and its citizens of the right to
DENNIS J. OURY's honest services in the affairs of the Borough of
Bergenfield, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice to defraud,
knowingly and intentionally caused to be transmitted by means of
wire communication in interstate commerce certain writings,
signs, signals, pictures, and sounds, namely, an e-mail message
to OURY asking about the status of the Borough of Bergenfield's
payment of money to GGC, in violation of Title 18, United States
Code, Sections 1343 and 1346.

C.    On or about November 14, 2003, in Bergen
County, in the District of New Jersey and elsewhere, having
devised and intending to devise a scheme and artifice to defraud
the Borough of Bergenfield and its citizens of the right to
DENNIS J. OURY's honest services in the affairs of the Borough of
Bergenfield by means of materially false and fraudulent
pretenses, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice to defraud,
knowingly and intentionally placed and caused to be placed in a
post office and authorized depository for mail matter, and took
and received and caused to be taken and received therefrom,
certain mail to be sent and delivered by the United States Postal

48

Service, namely, a letter from the DEP Commissioner to the Mayor of the Borough of Bergenfield informing the Borough of the $600,000 Green Acres grant and loan award, in violation of Title 18, United States Code, Sections 1341 and 1346.

D.     On or about June 11, 2004, in Bergen County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud the Borough of Bergenfield and its citizens of the right to DENNIS J. OURY's honest services in the affairs of the Borough of Bergenfield by means of materially false and fraudulent pretenses, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice to defraud, knowingly and intentionally placed and caused to be placed in a post office and authorized depository for mail matter, and took and received and caused to be taken and received therefrom, certain mail to be sent and delivered by the United States Postal Service, namely, a letter from Individual 3 to defendant FERRIERO enclosing a Borough of Bergenfield check for approximately $128,625, payable to GGC, in violation of Title 18, United States Code, Sections 1341 and 1346.

49

**Racketeering Act #2**
**(The Retail & Entertainment Project Bribery and Extortion Scheme)**
**(Paragraphs 34-67 Above)**

Defendant JOSEPH A. FERRIERO committed the following acts, any one of which alone constitutes the commission of Racketeering Act #2:

A.    From on or about May 29, 2002, to on or about September 30, 2006, in Bergen County, in the District of New Jersey and elsewhere, defendant

JOSEPH A. FERRIERO

committed an act involving bribery, that is, defendant FERRIERO solicited, accepted and agreed to accept from the Virginia REIT, through the Teaneck Law Firm, a benefit, namely, a stream of $35,000 monthly payments, as consideration for (i) defendant FERRIERO's decisions, opinions, recommendations, and exercises of discretion as a party official, and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence, in violation of N.J. Stat. Ann. § 2C:27-2.

B. From on or about May 29, 2002, to on or about September 30, 2006, in Bergen County, in the District of New Jersey and elsewhere, defendant

JOSEPH A. FERRIERO

committed and attempted to commit extortion, which extortion obstructed, delayed, and affected interstate commerce, in that defendant FERRIERO solicited, demanded, and induced the Virginia REIT and its agents to provide him with a stream of $35,000 monthly payments, with their consent, based on the wrongful use of fear of economic harm, in violation of Title 18, United States Code, Sections 1951(a) and 2.

**Racketeering Act #3**
**(The SJC Scheme - Borough of Dumont)**
**(Paragraphs 68-76 Above)**

Defendant JOSEPH A. FERRIERO committed the following acts, any one of which alone constitutes the commission of Racketeering Act #3:

A.    From in or about August 2007 to in or about October 2008, in Bergen County, in the District of New Jersey and elsewhere, defendant

JOSEPH A. FERRIERO

committed an act involving bribery, that is, defendant FERRIERO solicited, accepted, and agreed to accept from the Software Developer a benefit, namely, a percentage share, or kickback, of the gross revenues received by C3 from the Borough of Dumont, in exchange for (i) defendant FERRIERO's decisions, opinions, recommendations, and exercises of discretion as a party official, and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence, in violation of N.J. Stat. Ann. § 2C:27-2.

B.    On or about December 30, 2007, in Bergen County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud the Borough of Dumont and to obtain money from the Borough of Dumont by means of materially false and fraudulent pretenses,

52

representations, and promises, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice, knowingly and intentionally caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, namely, an e-mail communication from the Software Developer in New Jersey to defendant FERRIERO in Colorado transmitting a contract and invoice between C3 and the Borough of Dumont, in violation of Title 18, United States Code, Section 1343.

      C.   On or about March 3, 2008, in Bergen County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud the Borough of Dumont and to obtain money from the Borough of Dumont by means of materially false and fraudulent pretenses, representations, and promises, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice, knowingly and intentionally caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, namely, an e-mail communication from representatives of the Nevada Company in Nevada to defendant FERRIERO in New Jersey attaching for completion documents necessary to establish SJC as the corporate vehicle through which

FERRIERO would receive the proceeds of the scheme, in violation of Title 18, United States Code, Section 1343.

D.    On or about April 15, 2008, in Bergen County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud the Borough of Dumont and to obtain money from the Borough of Dumont by means of materially false and fraudulent pretenses, representations, and promises, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice, knowingly and intentionally placed and caused to be placed in a post office and authorized depository for mail matter, and took and received and caused to be taken and received therefrom, certain mail to be sent and delivered by the United States Postal Service, namely, a mailing to the Nevada Company in Nevada, enclosing incorporation documents and money order issued by the U.S. Postal Service in order to establish SJC as the corporate vehicle through which defendant FERRIERO would receive the proceeds of the scheme, in violation of Title 18, United States Code, Section 1341.

**Racketeering Act #4**
**(The SJC Scheme - Township of Teaneck)**
**(Paragraphs 68-76 Above)**

Defendant JOSEPH A. FERRIERO committed the following act, which constitutes the commission of Racketeering Act #4:

From in or about August 2007 to in or about October 2008, in Bergen County, in the District of New Jersey and elsewhere, defendant

JOSEPH A. FERRIERO

committed an act involving bribery, that is, defendant FERRIERO solicited, accepted, and agreed to accept from the Software Developer a benefit, namely, a percentage share, or kickback, of the gross revenues received by C3 from the Township of Teaneck, in exchange for (i) defendant FERRIERO's decisions, opinions, recommendations, and exercises of discretion as a party official, and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence, in violation of N.J. Stat. Ann. § 2C:27-2.

**Racketeering Act #5**
**(The SJC Scheme - Borough of Wood Ridge)**
**(Paragraphs 68-76 Above)**

Defendant JOSEPH A. FERRIERO committed the following act, which constitutes the commission of Racketeering Act #5:

From in or about August 2007 to in or about October 2008, in Bergen County, in the District of New Jersey and elsewhere, defendant

JOSEPH A. FERRIERO

committed an act involving bribery, that is, defendant FERRIERO solicited and agreed to accept from the Software Developer a benefit, namely, a percentage share, or kickback, of the gross revenues received by C3 from the Borough of Wood Ridge, in exchange for (i) defendant FERRIERO's decisions, opinions, recommendations, and exercises of discretion as a party official, and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence, in violation of N.J. Stat. Ann. § 2C:27-2.

**Racketeering Act #6**
**(The SJC Scheme - Township of Saddle Brook)**
**(Paragraphs 68-76 Above)**

Defendant JOSEPH A. FERRIERO committed the following act, which constitutes the commission of Racketeering Act #6:

From in or about August 2007 to in or about October 2008, in Bergen County, in the District of New Jersey and elsewhere, defendant

JOSEPH A. FERRIERO

committed an act involving bribery, that is, defendant FERRIERO solicited and agreed to accept from the Software Developer a benefit, namely, a percentage share, or kickback, of the gross revenues received by C3 from the Township of Saddle Brook, in exchange for (i) defendant FERRIERO's decisions, opinions, recommendations, and exercises of discretion as a party official, and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence, in violation of N.J. Stat. Ann. § 2C:27-2.

### Racketeering Act #7
### (The SJC Scheme - Borough of Cliffside Park)
### (Paragraphs 68-76 Above)

Defendant JOSEPH A. FERRIERO committed the following acts, any one of which alone constitutes the commission of Racketeering Act #7:

A.     From in or about August 2007 to in or about October 2008, in Bergen County, in the District of New Jersey and elsewhere, defendant

### JOSEPH A. FERRIERO

committed an act involving bribery, that is, defendant FERRIERO solicited and agreed to accept from the Software Developer a benefit, namely, a percentage share, or kickback, of the gross revenues received by C3 from the Borough of Cliffside Park, in exchange for (i) defendant FERRIERO's decisions, opinions, recommendations, and exercises of discretion as a party official, and (ii) the decisions, opinions, recommendations, and exercises of discretion of public officials over whom defendant FERRIERO held apparent and actual influence, in violation of N.J. Stat. Ann. § 2C:27-2.

B.     On or about March 3, 2008, in Bergen County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud the Borough of Cliffside Park and to obtain money from the Borough of Cliffside Park by means of materially false and

fraudulent pretenses, representations, and promises, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice, knowingly and intentionally caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, namely, an e-mail communication from representatives of the Nevada Company in Nevada to defendant FERRIERO in New Jersey attaching for completion documents necessary to establish SJC as the corporate vehicle through which FERRIERO would receive the proceeds of the scheme, in violation of Title 18, United States Code, Section 1343.

        C.    On or about April 15, 2008, in Bergen County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud the Borough of Cliffside Park and to obtain money from the Borough of Cliffside Park by means of materially false and fraudulent pretenses, representations, and promises, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice, knowingly and intentionally placed and caused to be placed in a post office and authorized depository for mail matter, and took and received and caused to be taken and received therefrom, certain mail to be sent and delivered by the United States Postal Service, namely, a mailing to the Nevada Company in Nevada, enclosing incorporation

documents and money order issued by the U.S. Postal Service in order to establish SJC as the corporate vehicle through which defendant FERRIERO would receive the proceeds of the scheme, in violation of Title 18, United States Code, Section 1341.

D.    On or about July 9, 2008, in Bergen County, in the District of New Jersey and elsewhere, having devised and intending to devise a scheme and artifice to defraud the Borough of Cliffside Park and to obtain money from the Borough of Cliffside Park by means of materially false and fraudulent pretenses, representations, and promises, defendant

JOSEPH A. FERRIERO,

for the purpose of executing the scheme and artifice, knowingly and intentionally caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures, and sounds, namely, an e-mail communication from the Software Developer to Cliffside Park officials identifying the Software Developer as the sole member of C3 and intentionally failing to disclose defendant FERRIERO's financial interest in C3's contract with the Borough of Cliffside Park, in violation of Title 18, United States Code, Section 1343.

All in violation of Title 18, United States Code, Section 1962(c).

60

**COUNT 2**

(Conspiracy to Use Instrumentalities of Interstate Commerce to
Promote And Distribute the Proceeds of Bribery
and to Commit Mail and Wire Fraud)

1.   Paragraphs 68 to 76 of Count 1 of this Indictment are
hereby realleged and incorporated as if set forth in full herein.

## The Conspiracy

2.   From in or about August 2007 to in or about October
2008, in Atlantic and Bergen Counties, in the District of New
Jersey, and elsewhere, defendant

JOSEPH A. FERRIERO

did knowingly and intentionally conspire, combine, confederate
and agree with the Software Developer and others to commit
offenses against the United States, namely:

(a) to use and cause to be used the U.S. Mail and
facilities in interstate commerce with the intent to distribute
the proceeds of, and to promote, manage, establish, and carry on,
and facilitate the promotion, management, establishment, and
carrying on of, an unlawful activity--namely, the solicitation
and acceptance of bribes and kickbacks by a party official,
contrary to N.J. Stat. Ann. § 2C:27-2--and to thereafter act to
distribute the proceeds of, and to promote, manage, establish,
and carry on, and facilitate the promotion, management,
establishment, and carrying on of, the unlawful activity,
contrary to Title 18, United States Code, Sections 1952(a)(1) &
(3); and

61

(b) to use the United States mails and wire communications in interstate commerce for the purpose of executing a scheme and artifice to defraud and to obtain money and property from municipalities and other public entities in Bergen County by means of materially false and fraudulent pretenses, representations, and promises, contrary to Title 18, United States Code, Sections 1341 and 1343.

3.   It was an object of the conspiracy that defendant FERRIERO would use and cause the use of the U.S. Mail, wire communications, and other facilities in interstate commerce to promote, manage, establish, and carry on the unlawful activity of soliciting and accepting, through Braveside and SJC, concealed bribes and kickbacks from the Software Developer in exchange for defendant FERRIERO's agreement to use his position as BCDO Chairman to provide a favorable opinion of, recommend, and otherwise exercise official discretion in favor of, Xquizit and C3.  It was a further object of the conspiracy for defendant FERRIERO to intentionally and materially mislead local government officials regarding his financial interest in contracts obtained by Xquizit and C3, including through the use of the U.S. Mail and wire communications in interstate commerce, for the purpose of obtaining money, through Xquizit, C3, Braveside and SJC, from the municipalities and public entities that those officials represented.

## OVERT ACTS

4. In furtherance of the conspiracy and to effect its objects, defendant JOSEPH A. FERRIERO committed, and caused to be committed, the following overt acts in the District of New Jersey, and elsewhere:

A. In or about August 2007, defendant FERRIERO recommended C3 to the Dumont Public Official.

B. On or about August 13, 2007, defendant FERRIERO introduced the Software Developer to the Teaneck Councilperson.

C. On or about September 17, 2007, defendant FERRIERO sent an e-mail to the Software Developer requesting the name and address of the company the Software Developer wanted to use on the written contract memorializing defendant FERRIERO's agreement with the Software Developer.

D. In or about November 2007, defendant FERRIERO recommended C3 to the Saddle Brook Public Official.

E. On or about December 30, 2007, the Software Developer sent an interstate e-mail from New Jersey to defendant FERRIERO in Colorado transmitting a copy of C3's contracts with and invoices to the Borough of Dumont and Township of Teaneck.

F. On or about March 3, 2008, a representative of the Nevada Company sent an e-mail from Las Vegas, Nevada, to defendant FERRIERO in New Jersey, attaching for completion an Initial List of Managers or Managing Members and Resident Agent

63

of SJC.

G.    In or about April 2008, defendant FERRIERO signed
and executed the Initial List of Managers and Managing Members
and Resident Agent of SJC.

H.    In or about April 2008, defendant FERRIERO
recommended C3 to Cliffside Park Public Official #1.

I.    On or about April 15, 2008, the Ferriero Assistant
used the U.S. Mail to send the signed and executed Initial List
of Managers and Managing Members and Resident Agent of SJC to the
Nevada Company in Las Vegas, Nevada, together with a money order
issued by the United States Postal Service for $125.

J.    On or about April 24, 2008, defendant FERRIERO
forwarded to the Software Developer an e-mail dated April 17,
2008, sent from a representative of the Nevada Company in Las
Vegas, Nevada to defendant FERRIERO in New Jersey.

K.    On or about April 25, 2008, defendant FERRIERO
signed, on behalf of SJC, a letter agreement dated April 22,
2008, memorializing the terms of his arrangement with the
Software Developer.

L.    On or about April 29, 2008, the Software Developer
signed, on behalf of Braveside, the April 22, 2008 letter
agreement, memorializing the terms of the Software Developer's
arrangement with defendant FERRIERO.

M-O. From on or about May 16, 2008, to on or about September 18, 2008, defendant FERRIERO and the Software Developer caused Braveside to issue the following checks to SJC Consulting, LLC:

| OVERT ACT | DATE OF CHECK | AMOUNT | MEMO LINE OF CHECK |
|-----------|---------------|--------|--------------------|
| M | 5/16/08 | $4,125 | Q1/Q2 SB /Q1 Dumont |
| N | 7/27/08 | $5,125 | Q1: Teaneck Q2: Teaneck, Dumont + CP - Q2 (2 m) |
| O | 9/18/08 | $2,625 | Q3 Saddle Brook & Dumont |

P-S. From on or about August 1, 2008, to on or about October 1, 2008, defendant FERRIERO caused the following checks to be issued from SJC's bank account:

| OVERT ACT | DATE OF CHECK | AMOUNT | PAYEE |
|-----------|---------------|--------|-------|
| P | 8/1/08 | $4,000 | Joseph A. Ferriero |
| Q | 8/6/08 | $1,500 | Joseph A. Ferriero |
| R | 9/26/08 | $4,000 | Joseph A. Ferriero |
| S | 10/1/08 | $3,900 | Joseph A. Ferriero |

In violation of Title 18, United States Code, Section 371.

## COUNT 3
(Use of U.S. Mail and Facilities in Interstate Commerce to Distribute the Proceeds of and Promote State Law Bribery)

1. Paragraphs 68 to 76 of Count 1 of this Indictment and Paragraph 4 of Count 2 of this Indictment are hereby realleged and incorporated as if set forth in full herein.

2. On or about April 15, 2008, in Bergen County, in the District of New Jersey, and elsewhere, defendant

### JOSEPH A. FERRIERO

knowingly and intentionally did use and cause to be used the U.S. mail and facilities in interstate commerce with the intent to distribute the proceeds of, and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of, an unlawful activity--namely, the solicitation and acceptance of bribes and kickbacks by a party official, contrary to N.J. Stat. Ann. § 2C:27-2--and, thereafter, performed and attempted to perform acts to distribute the proceeds of the unlawful activity and to promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of, the unlawful activity, as follows:

| USE OF MAIL OR FACILITY | SUBSEQUENT ACT(S) |
|---|---|
| use of the U.S. Mail to send, from New Jersey to Las Vegas, Nevada, copies of incorporation documents for SJC Consulting, LLC, signed and executed by defendant FERRIERO | (a) execution by defendant FERRIERO, on or about April 25, 2008, of written agreement between SJC Consulting, LLC, and Braveside<br><br>(b) execution by the Software Developer, on or about April 29, 2008, of written agreement between SJC Consulting, LLC, and Braveside |

In violation of Title 18, United States Code, Sections 1952(a)(1) & (3) and Section 2.

67

## COUNTS 4-5
(Mail and Wire Fraud)

1.     Paragraphs 68 to 76 of Count 1 of this Indictment and Paragraph 4 of Count 2 of this Indictment are hereby realleged and incorporated as if set forth in full herein.

2.     From in or about August 2007 to in or about October 2008, in Bergen County, in the District of New Jersey and elsewhere, defendant

### JOSEPH A. FERRIERO

the Software Developer, and others knowingly and intentionally did devise and intend to devise a scheme and artifice to defraud the Borough of Dumont and the Borough of Cliffside Park and to obtain money from the Borough of Dumont and the Borough of Cliffside Park by means of materially false and fraudulent pretenses, representations, and promises.

3.     The object of this scheme and artifice to defraud was for defendant FERRIERO, the Software Developer and others to make false representations and act under false pretenses by actively concealing and intentionally not disclosing to these municipalities and their officials defendant FERRIERO's personal financial interest in the municipalities' contracts with C3, so that C3 could obtain favorable treatment in connection with contracts with these municipalities from which defendant FERRIERO would secretly profit.

68

4.    On or about the dates set forth below, for the purpose of executing and attempting to execute this scheme and artifice to defraud, defendant

JOSEPH A. FERRIERO

knowingly placed and caused to be placed in a post office and authorized depository for mail matter, and took and received therefrom, and caused to be delivered thereon, certain mail to be sent and delivered by the United States Postal Service, as described below, and transmitted and caused to be transmitted by means of wire communication in interstate commerce certain writings, signs, signals, pictures and sounds, as further described below:

| COUNT | APPROXIMATE DATE | MAIL OR WIRE | DESCRIPTION |
|-------|------------------|--------------|-------------|
| 4 | April 15, 2008 | Mail | Mailing of incorporation documents and money order issued by U.S. Postal Service in order to establish SJC as corporate vehicle through which defendant FERRIERO would receive proceeds of scheme |
| 5 | July 9, 2008 | Wire | E-mail communication from the Software Developer to Cliffside Park officials identifying the Software Developer as sole member of C3 and intentionally failing to disclose defendant FERRIERO's financial interest in C3's contract with the Borough of Cliffside Park |

In violation of Title 18, United States Code, Sections 1341 and 1343 and Section 2.

## FIRST FORFEITURE ALLEGATION

1.   The allegations contained in Count 1 of this Indictment are hereby repeated, realleged, and incorporated by reference herein as though fully set forth herein for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 1963 and Title 28, United States Code, Section 2461(c).

2.   The United States hereby gives notice to the defendant charged in Count 1 of this Indictment that, upon conviction of the offenses charged in that Count, the government will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 1963.

3.   The defendant, JOSEPH A. FERRIERO

i.   has acquired and maintained interests in violation of Title 18, United States Code, Section 1962, which interests are subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1); and

ii.   has property constituting and derived from proceeds obtained, directly and indirectly, from racketeering activity, in violation of Title 18, United States Code, Section 1962, which property is subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(3).

4.    The interests of the defendant subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 1963(a)(1) and (3), include but are not limited to, a sum of money equal to at least $1,856,500.

5.    If any of the property described in paragraphs 3 and 4 above, as a result of any act or omission of a defendant --

(1) cannot be located upon the exercise of due diligence;

(2) has been transferred or sold to, or deposited with, a third party;

(3) has been placed beyond the jurisdiction of the court;

(4) has been substantially diminished in value;  or

(5) has been commingled with other property which cannot be divided without difficulty;

the court shall order the forfeiture of any other property of the defendant up to the value of any property set forth in paragraphs 3 and 4 above.

All pursuant to Title 18, United States Code, Section 1963.

72

## SECOND FORFEITURE ALLEGATION

1.    The allegations contained in Counts 4 and 5 of this Indictment are hereby realleged and incorporated by reference for the purpose of noticing forfeitures pursuant to Title 28, United States Code, Section 2461(c).

2.    The United States hereby gives notice to the defendant charged in Counts 4 and 5 of this Indictment that, upon conviction of the offenses charged in those counts, the government will seek forfeiture, in accordance with Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 981(a)(1)(C), of any and all property, real or personal, that constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Sections 1341 and 1343, alleged in Counts 4 and 5 of this Indictment, including but not limited to a sum of money equal to at least $11,875.

3.    If by any act or omission of the defendant, any of the property subject to forfeiture described in paragraph 2 herein:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party,

c.    has been placed beyond the jurisdiction of the court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty,

73

subdivided without difficulty,

the United States of America will be entitled to forfeiture of

substitute property up to the value of the property described

above in paragraph 2, pursuant to Title 21, United States Code,

Section 853(p), as incorporated by Title 28, United States Code,

Section 2461(c).

A TRUE BILL

PAUL J. FISHMAN
UNITED STATES ATTORNEY

74

CASE NUMBER: _13- CR. 592 (ES)_

## United States District Court
## District of New Jersey

UNITED STATES OF AMERICA

v.

JOSEPH A. FERRIERO

# INDICTMENT FOR

18 U.S.C. §§ 371, 1341, 1343,
1952(a)(1) & (3), 1962(c) & § 2

A True Bill,

_____

Foreperson

PAUL J. FISHMAN
U.S. ATTORNEY
NEWARK, NEW JERSEY

RACHAEL A. HONIG
ASSISTANT U.S. ATTORNEY
(973) 645-2777

*RAD 8